# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-1293

JACOB ROOT,

     Plaintiff,

     v.

OFFICER ROBERT COMSTOCK, in his individual capacity;

CITY OF COLORADO SPRINGS, a municipality,

     Defendants.

---

## AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiff, by and through his attorneys, Tyler A. Jolly and Harry M. Daniels, hereby files this Amended Complaint pursuant to FRCP 15 (a) (1)(B)(2) and LCivR 15.1(a), and respectfully alleges for his Complaint and Jury Demand as follows:

### INTRODUCTION

*Prior to using force, an officer shall identify himself or herself as a peace officer. The officer shall give a clear verbal warning of their intent to use force.*

***Colorado Springs Police Department General Order 500 Use of Force Policy.***
**Effective Date: 8/2/2021**

1. On May 16, 2022, Officer Robert Comstock of the Colorado Springs Police Department shot Jacob Root in the back with his TASER weapon while Mr. Root was running away from him. Officer Comstock did not give Mr. Root any prior warning that he would use his TASER weapon before shooting Mr. Root in the back.

2. Jacob Root was shot in the back, experienced muscular incapacitation, fell face first to the ground, and broke his neck. Jacob Root is now a quadriplegic.

3. Plaintiff seeks compensatory and punitive damages against the Defendant.

4. TRIAL BY JURY IS DEMANDED.

## JURISDICTION AND VENUE

5. This action arises under the Constitution and laws of the United States and is brought pursuant to Title 42 U.S.C. §1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §1331. Jurisdiction supporting Plaintiff's claims for attorney fees and costs is conferred by 42 U.S.C. §1988.

6. Jurisdiction for Plaintiff's supplemental state law claim, brought under Colorado state law, including the Colorado Enhance Law Enforcement Integrity Act, C.R.S §13-21-131 *et. seq.* is conferred by 28 U.S.C §1367.

7. Venue is proper in the District of Colorado pursuant to 28 U.S.C. §1391(b). All events alleged herein occurred within the State of Colorado.

## PARTIES

8.  At all times pertinent to the subject matter of this litigation, Plaintiff Jacob Root (hereinafter Plaintiff or Mr. Root) was a citizen of the United States of America and a resident of, and domiciled in, the State of Colorado.

9.  Defendant City of Colorado Springs, Colorado, is a municipality organized under the laws of the State of Colorado and is a "person" subject to suit under 42 U.S.C. §1983. The Colorado Springs Police Department ("CSPD") is a law enforcement agency that is part of the City of Colorado Springs. Defendant City of Colorado Springs is responsible for the oversight, supervision, discipline, and training of CSPD officers including Defendant Robert Comstock.

10. At all relevant times, Defendant Robert Comstock (hereinafter Defendant Comstock) was a citizen of the United States and a resident of, and domiciled in, the State of Colorado. At all times pertinent, Defendant Comstock was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer, and Officer Comstock was employed by the Colorado Springs Police Department.

## **FACTUAL ALLEGATIONS**

11. On May 16, 2022, thirteen law enforcement officers across three agencies (Colorado Springs Police Department, El Paso County Sheriff's Office, and Colorado State Patrol) were working together as part of the "BATTLE" (Beat Auto Theft Through Law Enforcement) task force. Defendant Comstock was working as a member of the BATTLE task force as part of the Colorado Springs Police Department.

12. The task force officers had received a report that a 2017 Ford Fusion had been stolen about 10 days prior on May 6th, 2022. The complaining witness alleged that her car was stolen from a parking lot near her home sometime during the night of May 6th. The complaining witness informed law enforcement that she had left the car unlocked with a key fob inside.

13. On May 16, 2022, members of the task force discovered the 2017 Ford Fusion in the parking lot of the Super 8 Motel at 1790 Aeroplaza Dr. in Colorado Springs. The Ford Fusion was unoccupied.

14. Rather than recover the unoccupied car, the task force members affixed a tracking device to the car. Thereafter, task force members followed the Ford Fusion to a Kum & Go gas station at 3208 North Nevada Ave. and then to the Aspen Lodge Hotel at 3990 North Nevada Ave.

15. Once at the Aspen Lodge, task force members located the Ford Fusion, which was again unoccupied. Rather than seize the unoccupied car, task force members waited for the driver to return and enter the car.

16. At that point, task force members drove multiple vehicles into the parking lot of the Aspen Lodge. The task force members attempted to block the car from leaving the parking lot. However, Colorado Springs Police Officer Leigh Avila described the Ford Fusion being able to get around her police cruiser, colliding and causing damage to her front passenger bumper in the process. The task force officers did not immediately pursue the Ford Fusion.

17. Officers later tracked the Ford Fusion to a Kum & Go gas station at 2588 Airport Road in
    Colorado Springs.  Upon arrival, the Ford Fusion was parked on the east side of the
    building and Mr. Root was inside the car.

18. Officers watched Mr. Root get out of the car and enter the gas station.  While Mr. Root
    was in the gas station, the task force members surrounded the building and parking lot.
    The task force officers did not enter the gas station while Mr. Root was inside.

19. Defendant Comstock parked his car at the southwest corner of the gas station and walked
    towards the front entrance to the gas station.

20. Mr. Root exited the gas station holding a ½ gallon of milk in his hand.  Upon seeing the
    officers, Mr. Root began to run past the gas pumps and towards the sidewalk on Airport
    Road.

21. As Mr. Root was running, Colorado State Patrol Detective Wolff shot at Mr. Root with a
    "Bola Wrap."  Meanwhile, Defendant Comstock began to chase Mr. Root on foot.

22. Defendant Comstock drew his TASER weapon while chasing Mr. Root from behind in
    the gas station lot.  Mr. Root then began running down the elevated slope dividing the gas
    station from the sidewalk on Airport Road.  The slope dividing the gas station from the
    sidewalk was covered in dirt and uneven rocks.

23. Defendant Comstock pointed his TASER weapon at Mr. Root's back as he ran down the
    slope. Then, without warning Mr. Root that he would use his TASER weapon, Defendant
    Comstock shot Mr. Root in the back.  Mr. Root experienced muscular incapacitation upon

being shot with the TASER.  Mr. Root, who could not use his hands or arms to break his

fall, fell head-first down the decline, across the sidewalk, and off the curb down into the

street.

24. Mr. Root remained face down in the street, face bloodied and groaning in agony, as

officers surrounded him and placed him in handcuffs.  Mr. Root, who broke his neck

during the fall, told the officers as they handcuffed him that he could not move.

25. Mr. Root did *not* have any weapon at the Kum & Go gas station.  Mr. Root did *not* make

any verbal threat that he was armed or that he intended to use force against any officer or

other person at the Kum & Go gas station.  Mr. Root did *not* use or attempt to use force

against any officer or other person at the Kum & Go gas station.  Mr. Root was running

away from Defendant Comstock when he was shot in the back.

26. Mr. Root's injuries include but are not limited to: quadriplegia, loss of constitutional and

federal rights, physical injuries, impairments and disfigurement, great pain and emotional

distress, and/or aggravation of pre-existing conditions, and ongoing special damages

medically/psychologically related treatment caused by the unconstitutional and moving

forces concerted conduct of all the Defendant.

27. Mr. Root also continues to suffer ongoing emotional distress, with significant PTSD-type

symptoms, including sadness, anxiety, stress, anger, depression, frustration, sleeplessness,

nightmares and flashbacks from this unlawful use of force.

28. Mr. Root is also entitled to punitive damages on all of his claims against Defendant Comstock personally to redress his willful, malicious, wanton, reckless, and fraudulent conduct.

**Defendant Colorado Springs is municipally liable for Defendant Comstock's actions and has a custom and practice of using and ratifying excessive force.**

29. It has long been the custom and actual practice of CSPD to engage in, encourage, and condone the use of excessive force by CSPD officers.

30. Colorado Springs did not terminate or discipline Defendant Comstock for his actions against Mr. Root. Further, CSPD did not recommend any further training or counseling for Defendant Comstock, despite his actions against Mr. Root.

31. Colorado Springs' and the CSPD's official position regarding the shooting of Mr. Root in the back, causing him to fall and break his neck, was and is that Defendant Comstock's actions were appropriate, consistent with, and engaged in pursuant to all approved police policies, practices and training of the City of Colorado Springs and the CSPD.

32. This ratification of the conduct that caused Mr. Root's quadriplegia is not alleged as proof that this ratification itself "caused" Mr. Root's injuries. Rather, it evidence that the conduct was engaged in pursuant to policy, custom, and practice of the CSPD. Had Defendant Comstock's actions been *outside* of the policy, disciplinary or remedial action would have been taken.

33. Defendant Comstock acted intentionally, knowingly, willfully, wantonly, maliciously and/
    or recklessly in disregard to Mr. Root's federal protected rights, and acted under the
    preexisting and ongoing deliberately indifferent custom, policy, practice, training, and
    supervision of Defendant Colorado Springs acting under color of state law.

34. The custom and practice of excessive force is evidence by a considerable number of other
    events, as detailed in at least the following examples:

    **De'Von Bailey**

35. In 2019, CSPD officers shot and killed De'Von Bailey, a 19-year-old.  Mr Bailey was
    shot in the back as he ran from officers.  The officers involved gave orders for Mr. Bailey
    to stop running, but the officers gave no warning that they intended to shoot nor use
    deadly force against Mr. Bailey as he ran away.  Multiple witnesses stated that Mr. Bailey
    did not look back toward the officers, nor did Mr. Bailey make any threatening gesture or
    motion towards the officers as he ran away.  Nevertheless, the officers shot Mr Bailey in
    the back.  The CSPD's official position was that the conduct of the officers involved in
    shooting Mr. Bailey in the back was appropriate, consistent with, and engaged in pursuant
    to all approved police policies, practices, and training of the City of Colorado Springs and
    the CSPD.  Despite the position of the CSPD, the City of Colorado Springs agreed to
    settle with the estate of Mr. Bailey for nearly 3 million dollars.

    **Dalvin Gadson**

36. On October 9, 2022, CSPD officers violent beat Dalvin Gadson, a homeless United States
    veteran.  Mr. Gadson was stopped by CSPD officers for failing to display a license plate

on his vehicle.  However, when Mr. Gadson questioned why he was being told to get out

the car, CSPD officers attempted to physically remove him from the car.  The CSPD

officers did not provide any warning of their intention to use physical force against Mr.

Gadson.  The CSPD officers proceeded to punch and knee Mr. Gadson more than twenty

times.  Mr. Gadson suffered a traumatic brain injury as a result of the excessive force by

the CSPD officers.  However, the Colorado Springs Police Department asserted that the

officers involved had not violated any CSPD policy, and the officers remained in good

standing with CSPD.  Nevertheless, the City of Colorado Springs has agreed to pay 2.1

million dollars as a settlement in Mr. Gadson's case.

**Tyrone Moss**

37. On March 12, 2022, CSPD officers responded to a reported disturbance at Wood's Bar

and Grill.  Once there, the CSPD officers began investigating a man in a white hoody

who was allegedly in possession of a firearm.  That person was not Mr. Moss, and CSPD

officers had no evidence that Mr. Moss was engaged in any crime.  Mr. Moss was near

the scene of the investigation, and he simply began walking away.  CSPD officers

ordered Mr. Moss to stop walking away.  Mr. Moss complied and turned around to face

the officers.  The officers then threatened to use their TASER weapons on Mr. Moss.  Mr.

Moss asked, "For what?"  The officers then proceeded to shoot Mr. Moss with a TASER

weapon.  Again, the City of Colorado Springs took the position that the officers were

acting within the scope of their employment and acting in good faith.  On information

and belief, the City of Colorado Springs has agreed to settle this case with Mr. Moss.

**Michael Sexton**

38. On June 7, 2019, Michael Sexton flipped the middle finger to a CSPD officer as the officer drove by on the street and as Mr. Sexton stood on the sidewalk.  The CSPD officer got out of his car, grabbed Mr. Sexton by the arm, and forced Mr. Sexton against his patrol car.  The CSPD officer then claimed that his use of force against Mr. Sexton was due to Mr. Sexton jaywalking.  The CSPD officer was not disciplined for his wrongful arrest, clear violation of the First Amendment, and unlawful use of force.  On information and belief, the City of Colorado Springs settled the lawsuit filed by Mr. Sexton.

**Jeffrey Melvin**

39. On April 26, 2018, CSPD officers responded to a noise violation at an apartment complex in Colorado Springs.  After the officers had determined that no crime had been committed, there was no ongoing crime, and those present did not have outstanding warrants, they encountered Jeffrey Melvin, Jr., a young black man arriving at the apartment.  The officers had no reason to believe that Mr. Melvin had been or was about to be engaged in any criminal activity.  The two officers nevertheless attempted to arrest Mr. Melvin.  While attempting to unlawfully arrest Mr. Melvin—without probable cause to believe that he had committed any crime—these officers used overwhelming force against him.  The officers aggressively manhandled Mr. Melvin, threw him to the ground, and repeatedly tased him.  Mr. Melvin briefly escaped the officers' wholly unconstitutional assault, only to collapse from the extreme trauma the officers had inflicted on him.  He was rushed to the hospital, but Mr. Melvin never regained

consciousness and died from his injuries days later, at the age of 27.  This excessive force

is the subject of the federal civil rights action captioned *Estate of Jeffrey Melvin, Jr. v.*

*Colorado Springs, et al.*, Case no. 20-cv-00991-CMA- KMT (D. Colo. 2020).

**Ryan and Joey Brown**

40. On March 25, 2015, brothers Ryan and Joey Brown were pulled over by CSPD officers.

The brothers were young black men who were driving to their home.  CSPD officers had

no grounds on which to pull them over, and officers would not tell the Brown brothers

why they had been pulled over.  Instead, the officers held them at taser- and gunpoint.

Though the brothers had done nothing wrong, the officers ordered them out of their car at

gunpoint, frisked them, threw Ryan to the ground and threw his phone away to stop him

from recording the interaction. The officers wrongfully arrested both brothers, and CSPD

responded to the brothers' complaint about their mistreatment by determining that the

officers conduct was within official policy and justified.  Colorado Springs paid $212,000

and made substantial policy changes to settle the Brown brothers' claims.

**Grant Bloomquist**

41. In 2013, CSPD officers arrested Grant Bloomquist without probable cause after he

verbally protested two CSPD officers' beating of another man outside of a nightclub. Mr.

Bloomquist was outside Cowboys Night Club in Colorado Springs and saw officers

brutally beating an African American man, so he stepped to about 7 feet away and said,

"get the fuck off him."  At that point, he was blindsided and struck by an officer, who hit

him in the face.  Multiple CSPD officers struck Mr. Bloomquist repeatedly in the groin

area with knee strikes and pinned him against a police vehicle. The officers then threw

him in the police car and arrested him. Colorado Springs settled a lawsuit based on

CSPD officers' conduct against Mr. Bloomquist in 2016.

**John Sturgis**

42. On January 26, 2012, CSPD officers arrested John Sturgis without probable cause and

subjected him to excessive force while investigating Mr. Sturgis as a homicide suspect.

Mr. Sturgis was not the perpetrator of any crime. A witness had allegedly told CSPD

officers he had seen a man at a gas station—Mr. Sturgis—who he claimed resembled a

homicide suspect. Mr. Sturgis in fact was twice the age of the suspect (40 vs 20), was

bald when the suspect had hair, and exhibited many other physical dissimilarities with the

suspect. Despite these obvious differences, officers followed Mr. Sturgis and arrested

him. Mr. Sturgis surrendered peacefully and asked the officers not to handcuff him

behind his back because he had recently had surgery on his shoulder; he even offered to

show the officers MRI images of his injured shoulder that were sitting on the front seat of

his car as proof. The officers ignored Mr. Sturgis's pleas, and excessively forcefully

handcuffed him behind the back despite his pleas not to do so, causing Mr. Sturgis to

significantly reinjure his shoulder and require further surgery. Several officers falsified

their reports about the incident to invent probable cause to arrest Mr. Sturgis. Colorado

Springs determined that the officers' conduct was within policy, but paid $300,000 to

settle Mr. Strugis's claims.

**Douglas Sellier**

43. On June 2, 2009, CSPD officers came to Douglas Sellier's home to retrieve Mr. Sellier's grandson.  When Mr. Sellier insisted that the man to whom the officers were bringing the child was a sex offender, the officers told Mr. Sellier he was under arrest.  Officers grabbed Mr. Sellier.  He lost consciousness and came to while pinned on the ground by CSPD officers.  While Mr. Sellier was pinned to the ground, a CSPD officer punched him three times in the shoulder and another officer deployed his taser on Mr. Sellier twice.  Mr. Sellier filed suit, arguing that CSPD officers had used excessive force against him.  After a federal judge denied the Defendants' motion for summary judgment, Colorado Springs settled Mr. Sellier's clams for $50,000.  Colorado Springs argued that the police officers conduct was within police department policy and appropriate.  Colorado Springs never disciplined or counseled the CSPD officers involved.

44. Several of these representative cases resulted in Colorado Springs paying substantial monetary sums to settle police misconduct and excessive force claims.  Yet, the facts surrounding Mr. Root's case make clear that the Colorado Springs Police Department has yet to adequately train and supervise its officers regarding the appropriate and legal use of force or otherwise ensure that the ongoing custom and practice of police using excessive force, as occurred here, ends.

45. Defendant Colorado Springs knew, based on its long history and widespread practice of its officers using excessive force and its condoning of those actions, that its officers would likely use excessive and unnecessary force against persons like Mr. Root.

46. Knowing this, Defendant Colorado Springs could have, and should have, pursued reasonable methods for training and supervising CSPD officers, including the individual Defendant, in not using excessive force, but it failed to do so.

47. Defendant Colorado Springs has a policy that trains and tolerates its officers who use excessive and deadly force, even under circumstances where the officer or a third party is not at the time in imminent risk of death or serious bodily injury.

48. Additionally, on information and belief, Defendant Comstock, in 2021, previously shot and killed another individual while on duty, Ahmad Akeem Abdul Muhammad.  CSPD determined that Defendant Comstock had acted within CSPD policy and training in killing Mr. Muhammad.

49. Because Defendant Colorado Springs created and tolerated a custom of deliberate indifference and failed to adequately train and supervise CSPD officers in the constitutional use of force, individuals, like Mr. Root, have repeatedly been subjected to violations of their constitutional rights.

50. Defendant Colorado Springs fostered a policy of inaction in the face of knowledge that CSPD officers were frequently violating specific constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution, which is the functional equivalent of a decision by Colorado Springs itself to violate the Constitution.

51. Defendant Colorado Springs's "policy of inaction" and policies, customs, or practices in failing to properly train and supervise its employees were a moving force and proximate cause of Individual Defendant's violation of Mr. Root's constitutional rights.

52. CSPD has persistently failed to counsel or discipline CSPD officers for their similar uses of excessive force.  Colorado Springs's failure to find wrongdoing and failure to counsel or discipline Defendant Comstock in this case, the cases described above, and others reflects a custom, policy, or practice of encouraging, tolerating, and ratifying blatantly illegal conduct.  These encouragements, toleration of, and ratifications show that CSPD officers carry out such police misconduct under the policies of and regimen of training provided by Colorado Springs, and that such conduct is customary within CSPD.  The failure to find wrongdoing, failure to counsel, and failure to discipline serve as a ratification by Defendant Colorado Springs, CSPD, and the CSPD Chief of Police, as a decision-maker and policy-maker for the CSPD, of the illegal conduct of CSPD officers.

53. Despite being on notice from prior lawsuits, press, and settlements that continued tolerance of violations of constitutional rights was substantially certain to result in a constitutional injury like that suffered by Mr. Root here, Colorado Springs has consciously chosen not to remedy its deficient customs and chosen to instead ignore the risk of harm caused by the customs.

54. CSPD's approval and defense of the use of excessive force by CSPD employees sends a clear and unequivocal message to those employees—such approval and failure to appropriate respond actually *trains* CSPD law enforcement officers—that such use of excessive force is acceptable, consistent with policy, and is approved practice, causing the use of such excessive force to be likely or even inevitable in the future.

55. Colorado Springs is responsible for training its officers to ensure they perform their duties consistent with the law and to discipline their improper conduct, so officers can learn from their experiences and be deterred from engaging in future misconduct that violates the constitutional rights of people with whom the police interact.  Colorado Springs's failure to do so has communicated to, and trained, CSPD officers, including Defendant Comstock, that excessive force is authorized and tacitly (or explicitly) encouraged. The failure to counsel or discipline misconduct constitutes training which causes future similar unconstitutional conduct.

56. Colorado Springs' past ratification and toleration of similar unconstitutional conduct thus caused and was the moving force behind the Individual Defendant's use of excessive force against Mr. Root, and Colorado Springs' failure to discipline the Individual Defendant for this illegal use of force will lead to more unconstitutional conduct.

57. Defendant Colorado Springs' acts or omissions caused Mr. Root damages, because he suffered quadriplegia, physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, and sense of security and individual dignity, among other injuries, damages, and losses.

58. Defendant Colorado Springs' actions, as described, deprived Mr. Root of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and caused hum other damages.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Excessive Force in Violation of the Fourth Amendment

**(Jacob Root Against Defendant Comstock)**

59. Plaintiff here incorporates paragraphs 1-58 of this Complaint as if fully set forth herein.

60. 42 U.S.C. § 1983 provides that:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress....

61. Plaintiff in this action is a citizen of the United States and Defendant Comstock is a "person" within the meaning of Title 42 U.S.C. §1983.

62. Defendant Comstock acted under color of state law, within the course and scope of his employment, and in his capacity as an officer of the Colorado Springs Police Department at all times relevant to the allegations in this Complaint.  Further, Defendant Comstock's acts or omissions were conducted within the scope of his official duties or employment.

63. At the time of the complained events, Plaintiff had a clearly established constitutional right under the Fourth Amendment, as incorporated against the states under the Fourteenth Amendment, to be secure in his person from unreasonable seizure through excessive force.

64. Plaintiff also had the clearly established Constitutional right under the Fourth Amendment to bodily integrity and to be free from excessive force by law enforcement.

65. Any reasonable law enforcement officer knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

Defendant Comstock used force against Mr. Root without warning Mr. Root that he intended to use his TASER weapon. Further, Defendant Comstock shot Mr. Root in the back with his TASER weapon while Mr. Root was on elevated, uneven surface where a fall was likely to cause substantial injury or death.

66. The Defendant's actions and use of force, as described herein, were objectively unreasonable in light of the facts and circumstances confronting him and violated these Fourth Amendment rights of Plaintiff.

67. The Defendant's actions and use of force, as described herein, were also malicious and/or involved reckless, callous, and deliberate indifference to Plaintiff's federally protected rights. The force used by Defendant Comstock shocks the conscience and violated these Fourth Amendment rights of Plaintiff.

68. Defendant Comstock unlawfully seized the Plaintiff by means of objectively unreasonable, excessive and conscious-shocking physical force, thereby unreasonably restraining Plaintiff of his freedom.

69. Defendant Comstock's use of force caused serious bodily injury to Plaintiff. Specifically, Defendant Comstock's use of force resulted in the lifetime physical impairment and quadriplegia of Mr. Root.

70. Defendant Comstock engaged in the conduct described by this Complaint willfully, maliciously, in bad faith, and in reckless disregard of Plaintiff's federally protected constitutional rights.

71. Defendant Comstock acted with shocking and willful indifference to Plaintiff's rights and
his conscious awareness that he would cause Plaintiff severe physical and emotional
injuries.

72. The acts or omissions of Defendant Comstock were moving forces behind Plaintiff's
injuries.

73. The acts or omissions of Defendant Comstock as described herein intentionally deprived
Plaintiff of his constitutional rights and caused him other damages.

74. The Defendant is not entitled to qualified immunity for his actions.

75. As a proximate result of Defendant Comstock's unlawful conduct, Plaintiff has suffered
actual physical and emotional injuries, and other damages and losses as described herein
entitling him to compensatory and special damages, in amounts to be determined at trial.
As a further result of the Defendant's unlawful conduct, Plaintiff has incurred special
damages, including medical-related expenses and may continue to incur further medical
and other special damages-related expenses, in amounts to be established at trial.

76. On information and belief, Plaintiff will suffer substantial lost future earnings and
impaired earnings capacities from the not yet fully ascertained and in amounts to be
ascertained in trial.  Plaintiff is further entitled to attorneys' fees and costs pursuant to 42
U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.  There may
also be special damages for lien interests.

77. In addition to compensatory, economic, consequential and special damages, Plaintiff is entitled to punitive damages against Defendant Comstock under 42 U.S.C. §1983, in that the actions of Defendant Comstock have been taken maliciously, willfully, or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

78. The intentional actions or inactions of Defendant Comstock as described herein intentionally deprived Mr. Root of due process and of rights, privileges, and immunities secured by the Constitution of the United States of America.

### SECOND CLAIM FOR RELIEF

### Colo. Rev. Stat. § 13-21-131

### Colorado Constitution Article II, Section 7 – Excessive Force/Unlawful Use of Force

### (Jacob Root Against Defendant Comstock)

79. Plaintiff hereby incorporates paragraphs 1-58 as if fully set forth herein.

80. Article II Section 7 of the Colorado Constitution forbids unreasonable seizures, which includes seizures carried out with excessive force.

81. Pursuant to C.R.S. § 13-21-131:

> (1) A peace officer, as defined in section 24-31-901 (3), who, under color of law, subjects or causes to be subjected, including failing to intervene, any other person to the deprivation of any individual rights that create binding obligations on government actors secured by the bill of rights, article II of the state constitution, is liable to the injured party for legal or equitable relief or any other appropriate relief.

> (2)(a) Statutory immunities and statutory limitations on liability, damages, or attorney fees do not apply to claims brought pursuant to this section. The "Colorado Governmental Immunity Act", article 10 of title 24, does not apply to claims brought pursuant to this section.

> (b) Qualified immunity is not a defense to liability pursuant to this section.

82. Under CRS 18-1-707(1)

> Peace officers, in carrying out their duties, shall apply nonviolent means, when possible, before resorting to the use of physical force. A peace officer may use physical force only if nonviolent means would be ineffective in effecting an arrest, preventing an escape, or preventing an imminent threat of injury to the peace officer or another person.

83. No reasonable law enforcement officer would consider the Defendant's use of his TASER weapon, without any warning and while Mr. Root was at risk of sustaining serious injury or death due to a fall, to have been reasonable or justified under the circumstances. Additionally, Defendant Comstock's actions were in blatant disregard for his own agency's policies.

84. Defendant Comstock violated the Colorado Springs Police Department Conducted Electrical Weapon policy by shooting his TASER weapon without warning and while Mr. Root was on an elevated, uneven surface where a fall was likely to cause substantial injury or death.

85. Article II Section 7 of the Colorado Constitution forbids unreasonable seizures, which include seizures carried out with excessive force, like this one.

86. The Defendants' actions and use of force, as described herein, were also malicious and/or involved reckless, callous, and deliberate indifference to Plaintiff's rights under Article II Section 7 of the Colorado Constitution.

87. Defendant Comstock's unjustified, violent use of force and seizure of Mr. Root caused Mr. Root to fall, breaking his neck, resulting in his quadriplegia. Mr. Root experienced great physical pain, injury, terror, and was exposed to great risk of death. Defendant

Comstock's actions and inactions are the legal, direct, and proximate cause of Plaintiff's losses, including but not limited to, Mr. Root's permanent physical disabilities (quadriplegia), the physical and mental pain and anguish suffered by Mr. Root during the incident, Mr. Root's continued pain and suffering, Mr. Root's past, present, and future medical and care costs, Mr. Root's loss of freedom and enjoyment of life, and other compensatory and special damages including but not limited to Mr. Root's permanent lost earnings and earnings capacity. These actions constituted a violation of Mr. Root's rights secured in Article II, Section 7, 18, and 25 of the Colorado Constitution.

88. Plaintiff further seeks injunctive relief against Defendant Comstock, prohibiting him from maintaining P.O.S.T. certification. C.R.S. § 13-21-131(1) authorizes this court, upon a finding of Defendant's liability, to order "legal or equitable or any other appropriate relief." Plaintiff believes this injunctive relief, in the form of revoking Defendant Comstock's P.O.S.T. certification, would be particularly appropriate in this action, not only as a sanction for unlawful behavior, but also in an effort to protect the community from similar injury.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Customs, Policies, Practices, and Ratification
### (Jacob Root Against Defendant City of Colorado Springs)

89. Plaintiff hereby incorporates paragraphs 1-58 as if fully set forth herein.

90. Defendant Comstock acted as he did pursuant to, and because of, the customs, policies, training, and/or practices of Defendant Colorado Springs.

91. Defendant Comstock's actions were the direct result of Defendant Colorado Springs' promulgation, creation, implementation, or enforcement of policies, customs, or practices that failed to provide that CSPD officers, including Defendant Comstock, could not use excessive force on fleeing persons and/or the deliberate choice to follow a course of action from among various alternatives available to Defendants of not adequately training or supervising CSPD officers, including Defendant Comstock, regarding the constitutional use of force, given that the need for such training and supervision was so obvious, and the inadequacy of training and/or supervision was so likely to result in the violation of constitutional rights such as those described herein.

92. Defendant Colorado Springs knew to a moral certainty that CSPD officers would be required to arrest fleeing persons in the execution of their official law enforcement duties. The City armed its officers with firearms, TASERs, and other weapons. Thus, in light of the duties and responsibilities of CSPD officers who are inevitably called on to arrest fleeing persons, the need to train CSPD officers in the constitutional limitations on the use of force was so obvious that Defendant Colorado Springs's failure to do so constituted deliberate indifference to Mr. Root's constitutional rights.

93. Defendant Colorado Springs adheres to a policy and practice of permitting the use of excessive force generally, and specifically on fleeing persons. Adherence to such a policy makes permissible under official city policy the unconstitutional use of force.

94. Defendant Colorado Springs, through the Colorado Springs Police Department and Chief of Police (the primary decision-maker and policy-maker of the CSPD), has continually

ratified the excessive force of their CSPD officers through failure to investigate, failure to counsel, and failure to discipline officers who use excessive force. The past and present ratification of excessive force by CSPD and Defendant Colorado Springs condones the use of excessive force by CSPD officers, including the excessive force used against Mr. Root.

95. Defendant Colorado Springs knew or should have known that its acts or omissions were substantially certain to cause CSPD officers including Defendant Comstock to violate individuals' constitutional rights to be free from excessive force, and they consciously or deliberately chose to disregard this risk of harm in adhering to their policy, custody, or practice of failing to provide that CSPD officers can only use force against fleeing persons only within constitutional limits, and/or in deliberately choosing not to provide adequate training to CSPD officers in this area.

96. Therefore, Defendant Colorado Springs set in motion a series of events that it knew would cause an individual in a similar situation as Mr. Root to be deprived of the constitutional right to be free from excessive force at the hands of law enforcement. But for the above acts or omissions of Defendant Colorado Springs, Mr. Root would not have been subjected to a violation of his Fourth Amendment rights, and such a deprivation was a proximate cause and a natural and foreseeable consequence of these acts and omissions.

97. As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

98. The herein described acts or omissions of Defendants are the moving force and the legal, direct, and proximate cause of Plaintiff injuries and losses, including but not limited actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial. As a further result of the Defendant's unlawful conduct, Plaintiff has incurred special damages, including medical-related expenses and may continue to incur further medical and other special damages-related expenses, in amounts to be established at trial.

99. The intentional actions or inactions of Defendants as described herein intentionally deprived Mr. Root of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court enter judgment in his favor and against Defendant Comstock and Defendant City of Colorado Springs, and grant him all relief as allowed by law and equity, including by not limited to:

(a) Declaratory and injunctive relief, as appropriate;

(b) Economic losses on all claims allowed by law in the amount to be determined at trial;

(c) Compensatory and consequential damages, including, but not limited to, damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount of $100,000,000;

(d) Compensatory damages, including, but not limited to, damages for the medical costs incurred and future medical and care costs to be incurred by Mr. Root;

(e) Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(f) Attorneys' fees and the costs associated with this action under 42 U.S.C. §1988, C.R.S. §13-21-131, including expert witness fees, on all claims allowed by law;

(g) Pre- and post-judgment interest at the lawful rate;

(h) Any further relief that this Court deems just and proper, and any other relief as allowed by law.

**PLAINTIFF DEMANDS A TRIAL TO JURY ON ALL ISSUES SO TRIABLE.**

Dated this 16th day of May, 2024.

Respectfully Submitted by Attorneys for Plaintiff:

**JOLLY LAW, P.L.L.C.**

 /s/Tyler A. Jolly

Tyler A. Jolly, #52361
Jolly Law, P.L.L.C.
9996 W U.S. Highway 50, Unit 1090
Salida, CO 81201
Phone: 719-429-7359
Tyler@jollylawcolorado.com

**THE LAW OFFICES OF HARRY M. DANIELS, LLC**

 /s/Harry M. Daniels

Harry M. Daniels

4751 Best Road Suite 490
Atlanta, GA 30337
Tel. 678.664.8529
Fax. 800.867.5248
daniels@harrymdaniels.com